Kraft-Phenix Cheese Corporation, Appellee, v. H. B. Smith Machine Company, Appellant.

Gen. No. 35,895.

Opinion filed October 4, 1932. Rehearing denied October 15, 1932.

Jones & Key, for appellant; Wm. Y. Key, of counsel.

Nicholson, Crandall & Snyder, for appellee; John T. Chadwell and Russell Greenacre, of counsel.

Mr. Justice Gridley delivered the opinion of the court.

In an action in assumpsit to recover damages for claimed breach of contract for the manufacture and sale of certain special machines, there was a trial before a jury in January, 1932, resulting in a verdict and judgment against defendant for $1,290.16. The present appeal followed.

About two years after the commencement of the action plaintiff, on November 30, 1931, by leave of

court; filed an amended declaration consisting of four special counts and the common counts. In the first special count plaintiff avers that on February 16, 1929, plaintiff and defendant entered into a contract whereby the former promised to purchase of the latter "three certain machines with overhead arbors that could be used in sawing foraminous malted milk into rectangular bars of the dimensions 3″ x 1½″ x ½″, and defendant promised to manufacture, furnish and deliver to plaintiff such machines within 30 working days from the making of said contract"; that in consideration of defendant's promises plaintiff promised to pay to defendant the sum of $3,700,—"⅓ thereof ($1,233.34) at once and the balance within 30 days from the date of shipment of said machines"; that plaintiff paid $1,233.34 at the time of making the contract and has at all times since been ready to pay the balance when the same "should become due according to the terms of said contract"; that after the expiration of said 30 working days defendant tendered to plaintiff three machines as in compliance with said contract, which machines plaintiff accepted, but that the machines were not such as defendant had contracted to deliver, in that they "did not have overhead arbors as it was provided they should have in and by said contract"; that prior to the making of the contract plaintiff told defendant that the machines were being purchased by it "in order to conduct a business of manufacturing and selling foraminous malted milk bars of the dimensions set out hereinabove and that plaintiff then had a continuing offer from a customer for the purchase of all such malted milk bars as it might manufacture up to 1,000 pounds of such bars per day, from the filling of which orders it (plaintiff) could make large profits, which was in fact true"; that due to the failure of the machines furnished by defendant to comply with the contract, "plaintiff was obliged to procure other machines, with which to manufacture

such malted milk bars, and pay the cost thereof, and was also prevented from commencing its business of manufacturing said bars for a period of, to wit, seven (7) months''; that the machines delivered could not be used by plaintiff in sawing the malted milk into rectangular bars ''because of the aforesaid respects in which they differed from the machines which defendant contracted to deliver to plaintiff''; that the machines from the time of delivery were and are ''useless to plaintiff and without value, either for the purpose of its business or for the purpose of re-sale, or for any other purpose''; that plaintiff also incurred and paid certain costs and charges in connection with the shipping of the machines ''in the amount of $56.82''; and that by reason of the aforesaid facts plaintiff has been damaged in the sum of $40,000, etc.

The averments of the second, third and fourth special counts are substantially the same as in the first. The particular breach assigned in the second count is that defendant ''did not, within 30 working days from the making of said contract, deliver to plaintiff any machines, but did after said time deliver to plaintiff other machines, which plaintiff accepted but which were not in compliance with said contract, *in that* said machines could not be used in sawing foraminous malted milk with rectangular bars having the dimensions aforesaid.'' The particular breach assigned in the third count is substantially the same as in the second. In the fourth special count the particular breach assigned is that the three machines, as tendered by defendant and *accepted* by plaintiff, ''did not have overhead arbors, and could not be used . . . so that all the sawing operations performed by the three machines would be effected *as one continuous operation* in the manufacture of said malted milk bars,—the second machine taking stock from the first machine and the third machine taking stock from the second machine.''

To this declaration defendant filed a plea of the general issue, and also a notice that upon the trial it would give in evidence, as against plaintiff's claim, facts showing that it had fully complied with its contract and had delivered to plaintiff such machines as contracted for; that defendant had no knowledge of plaintiff's alleged contract with a customer relative to the manufacture of 1,000 pounds of malted milk bars per day; that plaintiff was not obliged to and did not secure other machines to manufacture said milk bars, and was not required to pay anything in expenses or otherwise for claimed improvements made on the machines; and that plaintiff is still indebted to defendant for the unpaid balance, $2,466.66, on the purchase price of the machines, which defendant will urge upon the trial should be set off as against plaintiff's alleged claim.

On the trial considerable evidence, oral and documentary, was introduced by the parties. Plaintiff's principal witness was Ernest E. Bellamy, who was in charge of the "malted milk division" of its business at its Chicago office. Its other witnesses were Frederick Beverly, in charge of its "milk plant" at Wausau, Wisconsin, and Edward Kraft, an assistant to the superintendent of said plant at Wausau. Defendant's principal witness was William A. Whiting, manager of defendant corporation, which for many years had been engaged in Chicago in the manufacture and sale of special machinery. Five other witnesses also testified in defendant's behalf.

Bellamy, plaintiff's witness, testified that during January, 1929, he had several conversations with Whiting in Chicago as to defendant manufacturing machines for plaintiff, in which he told Whiting what particular machines were wanted and for what purposes, and that, for Whiting's better understanding of the character and purpose of the machine, the witness and Whiting made a trip to plaintiff's plant at

Wausau, early in February, 1929, where they met Beverly and others, viewed the operation of certain machines and certain equipment and merchandise, and had further conversations. The witness then started to testify as to what Whiting then said as to defendant's ability to furnish the machines desired and within what time and as to what the machines and equipment would do. Thereupon defendant's attorney asked if plaintiff was relying upon a written or an oral contract, to which plaintiff's attorney replied that it was relying upon the written contract embodied in four writings which passed between the parties during February, 1929. Thereupon defendant's attorney objected to any testimony of the witness to prove a verbal contract at variance with the contract as written, or as tending to modify it. The court sustained the objection and said to plaintiff's attorney: "You will have to rely on the written contract." Thereupon plaintiff introduced in evidence, without objection, the four writings, as "Plaintiff's Exhibits 2, 3, 4, 5." Exhibit 2 is a letter or proposition, dated at Chicago, February 11, 1929, signed by defendant, per Whiting, and addressed to plaintiff at Chicago, as follows:

"As per conversation with your Mr. Bellamy we are pleased to quote you on three special machines for sawing up malted milk stock as per sample that you shipped to this office.

"The first or #1 machine will be for sawing the thick or larger blocks into sheets ½″ in thickness, and this machine will take 25 saws 28″ in diameter. This machine will be operated by the stock being placed on a carriage and pushed underneath the overhead arbor and the table to operate on double roller bearing rolls. The price of this machine is............$1500.

"The second machine will take the stock from the first machine and will have 9 saws and will rip this stock into strips 1½″ in width—operate on the same type of carriage. The price of this machine is..$1100.

"The third machine will cut the stock into lengths of 3″ and will use 6 saws; price................$1100. making a total of............................$3700. for the complete equipment. The prices are f.o.b. factory where built.

"We thank you for having the privilege of figuring with you, . . . But if we are to receive your valued order we would want to hear from you at once, . . . ; the only way that we can give you reasonable prompt shipment on this unit of three machines would be to work them in at the present time, and believe we can give you shipment of these three machines in 30 working days.

"Our usual terms for building special machinery are one-third cash; balance 30 days from date of shipment. . . . "

Exhibit 3 is an order, filled out on a printed blank in use by plaintiff. It is signed by it per F. G. Huston, purchasing agent, dated Chicago, February 12, 1929, and addressed to defendant at Chicago, as follows:

Purchase Order
#27428

"Please enter our order for the following:
Kraft-Phenix Dairies, Inc., Wausau, Wis.
Quantity        Description        Price
Special Sawing Equipment for malt milk as per *quotation* of February 11th, Price complete ...............................$3700.
f.o.b. *Minneapolis, Minn.*
DELIVERY guaranteed within 30 working days.
GUARANTEE—Mfgr. Guarantees Equipment to cut foraminous malted milk into bars as specified *in a satisfactory and efficient manner to purchaser.*
TERMS:............"

Exhibit 4 is defendant's letter, per Whiting, dated Feb. 13, 1929, written immediately upon the receipt of

plaintiff's said order, and addressed to it at Chicago, as follows:

"We have just received from Mr. Bellamy your purchase order #27428 for special sawing equipment for malt milk as per our *quotation* of February 11th; price for the complete machines $3,700; delivery guaranteed within 30 working days.

"You also have written into the contract: 'Manufacturer guarantees equipment to cut foraminous malted milk into bars as specified *in a satisfactory and efficient manner to purchaser.*' This is not customary on special machinery. We, the manufacturer, guarantee the equipment to cut foraminous malted milk into bars as specified. This is as far as we go on any guarantee where we manufacture special machinery. . . . We can do the work and will guarantee our machines to do the work, but we cannot accept an order saying, 'in a satisfactory and efficient manner to purchaser.' We do not know what you might expect. Also, our terms are one-third cash with order; balance in 30 days from date of shipment.

"If this will be satisfactory to you we are pleased to go ahead with the order and we need all the time possible to get these machines out in 30 working days from date of receiving confirmation from you of this order."

Exhibit 5 is plaintiff's letter to defendant at Chicago, dated February 16, 1929, as follows:

"Referring to your letter of the 13th in regard to our purchase order #27428.

"*Exceptions taken to our order as indicated in your letter of the 13th are O. K.*

"Please arrange to go ahead with this order and speed through to completion as we will either send check for $1,233.34 with this letter or under separate cover today."

After plaintiff's witness, Bellamy, had further testified that on February 17, 1929, he caused plaintiff's

check for $1,233.34 to be mailed to defendant at Chicago, plaintiff, without objection, introduced still another letter which it received from defendant, dated Chicago, February 18, 1929, in which the receipt of said check was acknowledged ''to apply on your order #27428 for special machines,'' etc., and in which it is stated that said machines are to be shipped ''in 30 working days from to-day, February 18th.'' The witness was then asked to ''give the conversation at Wausau'' *before* defendant's written proposition (exhibit 2) was made. Defendant objected to this testimony as an attempt to vary the terms of the written contract, but the objection was overruled by the court. And the witness testified in substance that the conversation was concerning the nature of the product plaintiff had to deal with; that he told Whiting of the use of similar machines in a certain ''Thompson'' plant, and that plaintiff ''wanted equipment that would cut a greater percentage of bars than in said Thompson plant''; that what was desired was equipment described ''briefly as overhead arbor saws, conveying food by one saw to the other *without the necessity of handling and delivering the finished bars''*; that Whiting said that defendant ''would have no difficulty in building machines of that description, *and that it would cut at least eighty (80) per cent. into finished bars.''* Defendant's motion to strike out this testimony was denied by the court.

Bellamy further testified in substance that the machines were built at Minneapolis, Minnesota, by the Mereen-Johnson Co., for defendant, and under its directions; that he (Bellamy) was informed of these facts and that the completion of the machines was expected about the end of February, 1929; that during February he went to Minneapolis and viewed the machines as they were being built and *gave instructions as to certain changes* to be made in the saws, which changes were made; that the machines were built with

underslung rather than overhead arbors, which change was *not* made at his request; that during April, 1929, he again viewed the machines in Minneapolis and was present when certain tests were made; that the machines were shipped from Minneapolis to Wausau on April 20, 1929, and arrived at Wausau about 5 days later; that plaintiff paid the freight from Minneapolis amounting to $53.34, and thereafter during the making of further tests of the working of the machines expended the additional sum of $3.48 for "slow motors"; that the tests at Wausau were not satisfactory; that they would not properly "cut the food"; that the "food flew all over the room"; that the "breakage *was over 80 per cent"*; that the machines had "underslung" arbors; that it was "impossible to secure *continuous* operation from one machine to the other"; that the machines "were not connected"; and that thereafter plaintiff ceased using the machines.

Defendant's witness, Whiting, because of the court's ruling allowing Bellamy to testify to conversations had before the making of the written contract as above outlined, testified that in one of his earlier conversations with Bellamy he (Bellamy) "asked about *automatic* machines; I told him they would cost $10,000 to $12,000, that is, machines that would *automatically* take the contents from one machine to another; he said that was too expensive; . . . nothing was said during my negotiations for the order about building and delivering machines that would *automatically* take the stock from one machine to the other without hand operation, after I told him the price of automatic machines." Whiting further testified that when he placed the order with Mereen-Johnson Co., that order directed that the machines be made with overhead arbors; that he never knew anything about the change to underslung arbors until advised by Mereen-Johnson Co. that the change had been made; that he was not at Wausau when the machines were first tested; that

he never received a complaint from Bellamy or plaintiff that the machines "were not cutting the materials as they were presumed to do"; that in May or June, 1929, he received word from Bellamy that the motors were running too fast; that thereafter by his direction the Mereen-Johnson Co. shipped lower speed motors; that these were installed July 2, 1929, when he was present at plaintiff's plant; that during August, 1929, defendant received a letter, dated August 7, 1929, from plaintiff, per Bellamy (introduced in evidence as Defendant's Exhibit 4), that the machines were "unsatisfactory"; that thereafter defendant notified plaintiff that unless it received the balance due on the purchase price of the machines, $2,466.66, it would commence suit therefor. Plaintiff's letter (defendant's exhibit 4) is in part as follows:

"May we call your attention to the fact that this equipment does not comply with your own specifications, which we accepted, inasmuch as none of the machines are made with overhead arbors, which are absolutely essential for this type of work, *neither does the second machine take the stock from the first as specified.* . . . We must insist upon the machines being taken off our hands or made to comply with the specifications of your *quotation.* Upon return to us of our *deposit* of $1,233.34, we stand ready to deliver and load machines on board freight car for such destination as you see fit to give us. You can take this as our refusal to accept said machines and our demand for return of the payment made."

Defendant's witness, R. E. Johnson, vice president of Mereen-Johnson Co., testified in part that the machines were built "as per orders received from defendant with some exceptions; we received no change from defendant; we received instructions to change the construction from Bellamy personally at different times; the first time was March 7th"; that defendant's signed order called for an overhead arbor machine, but

that we recommended to Bellamy on March 7th that it "was not the proper construction to do their work, and suggested to him that the machines would be better if they were made with underneath arbors"; that Bellamy said *"to go ahead and build the machines that way"*; that there was also the question about the first machine cutting bars in ½" thickness; that we recommended to him that "the first machine should cut it the thickest, so as to avoid breakage"; that he said to "go ahead and build the machine that way"; that we "did so according to the instructions received from him."

Much other and conflicting testimony as to the working of the machines was introduced, but, inasmuch as we have reached the conclusion that because of the errors of the trial court in admitting the improper and prejudicial testimony of plaintiff's witness, Bellamy, as above set forth and in giving erroneous and misleading instructions to the jury the judgment should be reversed and another trial had, we refrain from outlining such other testimony.

As above shown there was a written contract between the parties, embodied in plaintiff's exhibits 2, 3, 4 and 5, yet the court, over defendant's objection, allowed the witness, Bellamy, to testify in effect that in the conversations he had with defendant's manager, Whiting, prior to the making of the written contract, Whiting verbally agreed that the proposed three machines when built would together act automatically, and that of the material used "would cut eighty (80) per cent into finished bars." No such proposals are made in defendant's written proposition or "quotation" of February 11, 1927 (exhibit 2), which was accepted by plaintiff and became a binding written contract. This testimony, which varied the terms of the contract, should not have been admitted. (See *Fuchs & Lang Mfg. Co. v. Kittredge & Co.,* 242 Ill. 88, 94; *Davis v. Fidelity Fire Ins. Co.,* 208 Ill. 375, 382; *Mem-*

*ory v. Niepert,* 131 Ill. 623, 630.) We find no ambiguity in the contract as written, and we think, in view of all the facts and circumstances in evidence, that the admission of this testimony was prejudicial to defendant. Furthermore, this testimony was the basis of certain instructions offered by plaintiff and given to the jury by the court. For instance, in plaintiff's given instruction No. 6, the jury were instructed that ''if you believe from the evidence that defendant undertook and agreed, at the time plaintiff ordered the three machines in question, to deliver machines that would *in one continuous operation* cut foraminous malted milk chunks taken from the vacuum pan into small bars, approximately 3″ x ½″ x 1½″ in size, and that in such operation *at least eighty per cent of such chunks* run through said machines *would be cut into perfect bars,* if such facts are shown by the evidence, and if you further believe from the evidence that the machines delivered by defendant to plaintiff did not conform to said undertakings, if such facts are shown by the evidence, then the court instructs the jury that you should find for the plaintiff both on plaintiff's claim and on defendant's set-off.'' We are of the opinion that this instruction was erroneous and prejudicial. It virtually tells the jury that they are to construe the contract between the parties, whereas the court alone should construe the contract. (*Telluride Power Commission Co. v. Crane Co.,* 208 Ill. 218, 226.) Furthermore, the instructions taken as a series were misleading to the jury. For instance, in one the jury are instructed that ''plaintiff's exhibits 2, 3, 4 and 5 constitute the entire contract between the parties to this suit,'' yet in another instruction they are instructed that ''if you find the issues for the plaintiff on its claim, and against the defendant on its set-off, then you should assess the plaintiff's damages at the sum of $1,290.16.'' This sum is arrived at by adding

together the sum of $1,233.34, plaintiff's down payment on the contract, and the sums of $53.34 and $3.48, which Bellamy testified plaintiff expended respectively for "freight from Minneapolis" and for "slow motors." And we are of the opinion that this instruction as to the measure of plaintiff's damages is inconsistent with its theory of recovery as stated in its declaration. As we read the declaration, it is based upon an affirmance of the contract and seeks to recover damages (i. e. loss of profits and monies paid) because of certain claimed breaches of warranties contained in the contract. The declaration states in substance that plaintiff "accepted" the machines, but that they did not work as it was warranted they would. The instruction is based upon the inconsistent theory of plaintiff, also adopted by it, that it had rescinded the contract and sought to recover back the portion of the purchase price, which it had paid, and also certain expenses incurred. The law does not allow the prosecution of inconsistent remedies at the same time. (*Howe v. Fulton*, 225 Ill. App. 589, 600; *Park v. Richardson & Boynton Co.*, 81 Wis. 399, 402; *Abraham v. Browder*, 114 Ala. 287, 290; *Impervious Products Co. v. Gray*, 127 Md. 64, 69; *Houser & Haines Mfg. Co. v. McKay*, 53 Wash. 337, 339, 340.)

The judgment appealed from should be reversed and the cause remanded, and it is so ordered.

*Reversed and remanded.*

KERNER, P. J., and SCANLAN, J., concur.